As you are aware, Mr. Spencer has raised three claims which he asked the court to address and to order a new trial in this matter. The first claim is the Brady violation. The second claim is the admission of evidence by the police officers that Mr. Spencer claims was prejudicial to him in conjunction with the prosecutor's opening and closing arguments to the effect that suggested that Mr. Spencer was a drug dealer. And the third was the denial of his discovery motion on his claim of vindictive prosecution. I'd like to start with the claimed Brady violation. I know your honors are aware of the underlying facts, but I thought I'd just give a brief synopsis of what I think are sort of the case. In the first case, the jury was unable to come to a verdict and a mistrial was declared. After that happened, a juror sent Judge Sobel to the district court a note saying that the juror believed that what happened was unjust and unfair. The governor proceeded to a second trial and had the officers involved testified, as well as the state police chemist Claire Rimkus. The jurors came out after a number of time from deliberation and asked the judge if they could see the original drug certificate submitted by Ms. Rimkus, but the judge told them that it had not been entered into evidence. What happened with Ms. Rimkus is she testified at both trials, both the trial where the jury could not reach a verdict and the second trial in which the jury convicted Mr. Spencer of both counts. At the second trial, in the course of her cross-examination, it came to light that she had changed the drug certificate because she understood that the so-called incident date was wrong on that. When you say it came to light, I had understood that defense counsel had both forms. He did have both forms. So he knew exactly that there were two changes on it, other than writing corrector, and he knew what they were, and it was pretty obvious, it may have been obvious to someone enough to ask a question, why the change occurred. Right, and he did ask why the change occurred, but what wasn't obvious is, and what wasn't testified to at either trial, was that the prosecutor had represented, the trial prosecutor had represented that there was a clerical error. And at the second trial, it came to light that Ms. Rimkus was informed that there was this error on the date, and she changed it. And only after the trial, on the basis of an evidentiary hearing, the results of which are First, the defense never had any information that the prosecutor had called the state chemist and told her, you've got the wrong date here. Second, there was a call log that the chemist prepared, as well as e-mails back, I think it's two e-mails back and forth between the chemist and the prosecutor, and neither the call log or those e-mails were revealed. And as Judge Zobel found in her opinion, this was very problematic because, and I think this goes to the ultimate issue of prejudice, and whether there's a reasonable probability that a different result would have occurred if the defense had been made aware of this. And there's two things that Judge Zobel said that I think, in her own words, require that this case be overturned for a Brady violation. The first is that she said the second jury was interested in this issue. They asked a question about it, and if they had received this information, it may have cast doubt on the chain of custody. That's what Judge Zobel's findings were. Can you explain? Can you stay with that point, the prejudice point? Okay. Because the jury knows that there's been a change on the forms. It knows exactly what the change is. And then defense counsel doesn't ask how did the change, what prompted the change. So that's left as an open with the prosecution having the burden of proof. How does it help the defense if you had added to that record the answer to that question of how the change came about, which is the AUSA noticed the mistake and called the RIMCAS? Well, as Judge Zobel found herself, she said, I think her exact words were, if the jury knew that the prosecutor was involved in the process, then the jury may have believed that Ms. RIMCAS, I think she used the word, was sloppy at best or a pawn of the prosecution at worst. Those are Judge Zobel's findings, exactly. And one of the problems that the judge had was that it really shouldn't be the trial prosecutor's view of the evidence to say, hey, there's a mistake here and it needs to get changed, at least without revealing it to the defense. Just staying on that point, what would be the reasoning the jury would go through in which if it thought she was a pawn of the prosecution because of this one phone call, what in the record would allow a reasonable jury to conclude that, therefore, the sample wasn't the right sample or she faked the test results? It could be anything, Your Honor. It's really not the defendant's burden to prove that. No, I understand, but I'm saying we actually have a record in which the numbers match up, indicating that it's the same sample all the way through. Right, but of course, if we have another document from the Boston police, which lists a different incident date, lists that the drugs were seized as opposed to purchased, and so the jury could look at both of those things and say, well, wait, which one's the right one? I mean, I don't think there's anything magical. Just sticking with that, I'm just trying to get the logic of it. When you say which one was the right one, if it was seized rather than purchased, the idea would be that it's the wrong sample that she's testing? One of the intervening events was you have to realize that the drugs allegedly were seized on March 20th. They get submitted to the state lab six months later, I think it was September 26, 2013, so six months afterwards. And in the meantime, Mr. Spencer's one-time co-defendant, Mr. Morrison, also had a drug arrest. And so Mr. Spencer's claim is that perhaps those were the drugs affiliated with that same CC number. I mean, this isn't his burden to prove, but it does cast light on the accuracy of the documentary evidence. I guess just to stay with it, how does it? What would be a juror's rational thought process that knowing that the prosecutor had made this call to correct this incident date error, through what process would that suggest, oh, that connects to what in the record that would reasonably lead me to believe, therefore, it must have been the wrong sample? I don't know if the juror needs to necessarily find that it was the wrong sample, but it casts doubt on the validity of the CC number that runs through. And also, as Ms. Rimkus testified in the evidentiary, which hadn't come to light before, was that when she learned of the so-called error, she picked up the phone, called BPD, doesn't remember who she spoke to, and they said, oh, yeah, that's the right incident date. And Judge Sobel was very, very troubled by that, troubled by that process. I'm having trouble at least seeing how that additional fact actually helps the defendant, because it seems to me you're better off with these two inconsistent forms and no explanation as to what precipitated the change from one, and no testimony that she had confirmed it with the police as to the correct one. I disagree, because I think if I was the trial defense counsel, and I had this witness on the stand. By the way, Ms. Rimkus had been hired in January 2013. So when she performed the sample, it was nine months later. And I know there was some talk about what the state lab protocol should have been and would have been, but we know she was sort of a rookie chemist, and she gets a call from a very experienced federal prosecutor saying, this is the wrong date. And instead of going to her supervisor and saying, wait a minute, we need to follow the chain of custody here, she picks up the phone, talks to somebody unknown, and changes the date. And that's, I think as a trial counsel, I can make a lot of hay out of that. That's what I'm looking for. Could you make some of that hay? What would be the hay? Well, it makes her look inexperienced. Potentially she could make that kind of mistake and follow that kind of protocol. Perhaps she did the same thing with the drug testing. Again, this is cross-examination, and this is the foundation of our justice system to expose to light inconsistencies and to attack her credibility, maybe to attack her expertise. It's very relevant. And as we know from the jurors' question, they thought it was relevant too. I mean, they were interested in this chain of custody situation. And so I think this reliance on, oh, well, there's a CC number, and it was attached to this, and it must be right, especially when the drugs weren't transferred until six months after the fact and there was an intervening drug arrest of the co-defendant. This is something that Judge Zobel specifically found. I think she said it could cast doubt on the chemist's findings and also portray her as either sloppy or a pawn of the prosecution. Well, how far do we go? If we were to go your way, how far would it lead us? Would we be saying that every time an AUSA or someone in the prosecutor's office contacted a witness to confirm whether something was correct or not or to point out an error in what the witness had said, that that must always be part of the Brady package? Well, I don't believe it's contacting a witness per se. Obviously, you can contact a witness, ask about their trial availability, you may even have questions about the report because you're going to prepare them as a witness. But to tell a witness who was prepared under oath a certified drug certificate, this is wrong. And you have that conversation with that chemist. Judge Zobel said it was wrong. So the general rule would be then that you're asking us would be every time someone in the prosecution tells a witness that the prosecutor thinks there's something wrong in the witness's testimony and the witness changes it, that has to be produced as part of Brady. Well, I think that's the sort of standard fare that as a prosecutor, if you have a witness who changes their testimony, then you have to inform the defense. That you contacted them and told them you thought it was wrong. Well, I think that should be. I mean, if it's not part of Brady, it should be. But in any event, in this case... Whenever it would be prejudicial. Prejudicial, but also in this case, it's the fact that she prepared a certified under oath. Right? Because we tell prosecutors if you have a witness who testified under oath and they recant, then you certainly have to let the defense know. And in this case, it's not so much that he told her to change it, but that she did change it. And no one knew exactly why. What's your most analogous case among the cases you cite that would stand for this general proposition? That if a prosecutor contacts a witness to say, I think your testimony is wrong or your document is wrong and the witness changes it, the prosecutor must produce not only the changed version, but must also inform defense counsel that the change resulted from the prosecutor making the contact. Your Honor, I don't think I cited a case to that effect in my brief, and I'd be happy to, because I know that I'm almost positive that is the state of the law. So I'd be happy to submit a 28-J letter citing cases to that effect, if the court would allow me to do so. You can do so. Okay, thank you, Your Honor. Do Your Honors have any other questions about the Brady claim? If not, I'll move on to the second. I'm going to rest on the vindictive prosecution claim on my brief. Just briefly, I'd like to touch on another prejudice that occurred for Mr. Spencer. Again, as you know, there was a mistrial on the first case. On the second case, the officers again testified. And I believe that there were three significantly important things that they testified to that were prejudicial. The first is that one of the officers testified that he asked Mr. Spencer if he was on. And instead of just saying yes, he said he was on, he went on to say, oh, I know this from drug parlance to mean that this drug dealer is always dealing drugs. That's one of them. The second one is that instead of testifying exactly to the facts, which is that Mr. Spencer was standing at the bus stop and perhaps looking this way and that way, the officer was allowed to testify that Mr. Spencer was performing counter surveillance. Again, to suggest that he had some kind of more deeply connected position in this transaction than I believe that the facts suggest. And probably the most prejudicial is that one of the detectives who didn't even, you know, meet with Mr. Spencer but was observing, I believe, in a car from afar, was allowed to testify that he, in his experience, defendants work in pairs and work in tandem. And really, that's the jury's call as to, you know, what happened here. And the facts are very limited as to Mr. Spencer's involvement. You know, I think you're making very good arguments, but there's something that bothers me about your argument. That is, isn't it a fact that your client sold drugs to an undercover agent? In this transaction, Your Honor? I would say that's the issue for the jury. That's what the government presented as evidence. Well, the government presented as evidence that he was, he went and got Mr. Morrison, who actually engaged in the drug transaction. Well, what does that do to your case? Well, because I think if you look at the facts, Mr. Spencer's involvement was rather limited. I suggest that's perhaps why there was a first hung jury, because it was just, and there was no, besides Detective Casella's word, there was really no corroborating evidence. And he wasn't the one who gave the detective the drugs or collected the money for the drugs. And, you know, seemingly was on the street corner and, you know, the jury could find that he wasn't an active participant in this. And I believe this other testimony came in to prejudice him as opposed to just looking at the straight facts. Thank you very much, Your Honors. Good morning, Your Honors. Good morning. May it please the Court, Cynthia Young of the United States. Let me just make a couple of comments in response to the questions and correct a couple of facts. Would you mind putting that microphone just down a little bit towards there? Are you suggesting I'm too short for that? No, it was too high. Good answer. So the original drug certificate, which you asked about, Judge Chiata, that was actually in evidence. It was just not a signed, notarized copy of it. And what Judge Zobel misremembered in some of her initial orders was that she thought that the issue the jury was concerned about was chain of custody. It's actually not clear what they were concerned about, because all they asked was, do you have a signed, notarized copy of that drug certificate? Not do you have it, because it was already in evidence. It was put into evidence in the cross-examination of Claire Rimkus, the chemist. And just on that, on a related point, the drug certificate, it does have at the top of it, if you look, the original certificate is at A320. The final copy is at A323. What it has at the top is lab case number, defendant, agency, et cetera, date of incident, date submitted. And then it says below that, there's a line, I hereby certify that the following item, and it says, heat-sealed plastic bag, off-white rock powder, has been examined with the following results. And that's what the chemist is actually certifying. She is, in fact, certifying, and what the New Republic is certifying, are the facts of her testing of the drugs. And that, obviously, the chain of custody matters. But that's what she's certifying to. In this case, it actually matters a lot less, because, in fact, she testified. Because this evidence did not, the certificates themselves did not actually even need to be introduced into evidence. Because she testified, I got the sample, it had these numbers on it, and I did all the testing, and this is what I discovered. And I did a drug certificate to that effect. But what's important is that all of the numbers, the CC number that the BPD put on it, and the Massachusetts State Police lab number, are all consistent across the pieces of evidence. So what I wanted to just mention is what the defendant had at the time of trial to show that this really made no difference whatsoever, and there wouldn't have been any hay that the defense would have made it. At the time of the trial, the defendant had the police reports of the original March 20th transaction. It had the police reports of the arrests of both defendants. Morrison was arrested on May 20th, I believe, and Spencer was arrested on May 26th. And even the theory that this could have been Morrison's drugs, the wrong date in the original drug certificate was May 26th. That was the date of Spencer's arrest, not Morrison's arrest. And if you look at the SP-295, the information that has the wrong date of incident also has the place Spencer was arrested and the time he was arrested, which is 417 in the morning. What's the general practice as whether prosecutors turn over to the defense information of this hill? In other words, when a prosecutor contacts a witness and says there's a mistake in your document or your testimony is wrong, and the witness then changes the document or testimony, do prosecutors customarily disclose to defense counsel that it was the prosecutor that noticed and initiated that? It depends on what the actual issue was. If there's any suggestion that the prosecutor is getting the witness to change testimony just based on what the prosecutor said and not other evidence, then we would turn it over. We would turn over the changes. Should this have been turned over, this information, instead of just saying passive voice and this is a clerical error? I don't believe it needed to be turned over. If you look at the local rules, the local rules call for this would be exculpatory evidence favorable to the defense. If it cast doubt on the admissibility or if it cast doubt on I'm trying to remember, sorry, the language of the rule. Cast doubt on defendant's guilt as to any essential element or the credibility or accuracy of any evidence the government anticipates introducing in its case in chief. I don't think it applies to either one of them. As Claire Wimkes testified, she didn't know anything about the date of incident. It's completely superfluous information. What matters on that form is that the CC number and then the state police lab number are consistent across all the forms. Because remember, the CC number was assigned by Sean Flaherty, the officer in Boston Police Department. On the day of the incident, the drugs went from Officer Caselas who bought them to Sergeant Detective Keenan who took custody of them, put them in a heat sealed bag. Drives them back to B2 district headquarters. Gives them to Officer Flaherty. Officer Flaherty field tests them, puts them in a heat sealed bag, goes to this CAD terminal, which is some sort of computer thing. Can I just stop you there? Because I had thought, if I was hearing your opponent correctly, part of their theory of the case is that the chain of events you just described is not the only possible conclusion one could draw about what happened. Because of the gap in time between X and Y, that somewhere along the line, the wrong sample got into that bag. Is that what was presented at trial? No, the defense, that really was not attacked, and the defense knew about that big gap in time. Just as the defense had the SBA track site. I'm not asking what they knew about it. Of course they knew about it if they made that argument, that there was a gap and they were trying to capitalize on it. The question is whether if that was their theory of the case, it would assist them in making that theory of the case to have the additional evidence that the prosecutor then was speaking to the lab technician and telling them to change the report. Because the idea would be, see, they took such a long time, there's such a long gap, don't trust the numbers, don't believe that it's his drug that was in the bag, and look all the way up until the end, the prosecutor's still working the case, talking to the lab technician, she doesn't know what she's doing, she doesn't even check with anybody, she just does what the prosecutor tells her to do. That's their story, if I understand it, as to how this might matter. So what's wrong in that account with respect to either that doesn't show the threshold evidence that had to be disclosed, or that shows that even if it had to be disclosed there was no prejudice? Well, first let me just back up a little bit, which is at trial that was not the defense at all. The defense was there's no video, there's no recording, there's nothing. It was this didn't happen, in a sense. That's really what the, if you look at the defense lawyer's closing, it was there's no pictures, there's no recording, there's no audio, there's nothing. And so that was their defense, is that in some sense it sort of didn't happen and everybody is to be disbelieved, and that the case relied on Officer Caselas, who was the undercover officer, and that he was questionable in terms of his testimony. So that was the defense theory. This the defense latched onto sort of at the end of the cross-examination of the chemist as to why there were these two different drug certificates. But, again, didn't make much out of them, because RIMP has testified as to what she did. She's questioned about the original certificate and just said, I got this information and I made the change because the date was wrong. She also testified, I didn't know what the date was. The date was meaningless to me. What I knew was the CC number and the state police lab number. Those are the two things that I rely on, because she's not a recipient witness of the transaction. She is merely the chemist who gets the drugs. The drugs are marked. And that's what I was trying to get to, is the evidence that the defense had that it could have made hay with. The problem is it had the SP-295, which shows that the error was actually done by a Boston police officer in taking the drugs to the state police lab. Just wrote down the wrong date of incident. But remember also, the defense had and the jury had Exhibit 11, which unfortunately you don't have photos of. But Exhibit 11 was this... Just to make... Sorry to interrupt you, but just to make sure I understand it. Suppose, and I know this is not this case, suppose the prosecutor called and said, Oh, you wrote down the wrong CC number. And then she changes the CC number to match the original. That would be a problem and we would turn that over. Okay. Yes. Just a moment. The key thing here is that in your view, the thing that was ordered to be changed just is something that's just not material plausibly to whether what she was testing was right. Yes. Because she's not testifying as to the date of incident or even as to who the defendant is. She's just testifying, I received these drugs with this CC number, this state police lab number. I tested them and this is what I found. So she's not involved in the transaction at all. That's the only part that she's actually testifying to. And in the end, the drug certificate also is superfluous because it's her testimony that really controls here. But, so the defense had all of these things and did not make any use of them other than questioning her about why she changed the drugs, the original drug certificate. And going back to defense counsel's point about Claire Rimpus was brand new, she didn't know what she was doing, she just did this calling up. The answer is that she testified at the hearing. Yes, she was new, but she'd done 200 or 300 drug certifications by then, tests and certifications. She said that the protocol in the lab was when someone alerted the lab chemist or the technician as to a problem, this is what they did. They called the submitting agency and found out whether that information was right or wrong. And so that's what she did. She said she had done that on other occasions, usually with ADAs. And the wrong date of incident that she initially wrote down correlates to what date of irrelevance? And that's the May 26th, that's the arrest of Spencer. When no drugs were seized from him, he was arrested on May 26th. Just a question, if the wrong date she wrote down correlated to something that was related to the other party, that might be something he would then feel obliged to turn over? We might, depending on, it depends on what it is. For example, I don't remember, I'm sorry to say, I don't remember whether Morrison was seized with any drugs. I think he wasn't, I think he was just arrested, but I could be wrong. If there were drugs seized from him on that date, it might raise a different question. But here there was no drug seizure from Spencer on the date of arrest. So that's what all of this, and if you look, the date and the time and the place on the original certificate correspond exactly to the actual arrest information of Barry Spencer. Can I change the subject? You're in charge, yes. To satisfy my curiosity, how often do you transfer cases involving a $20 drug bust? We don't do it that often. We obviously do it often enough that some of the judges dislike it. But it depends, it's all very fact-bound. So there's an analysis that's done by the AUSA and by the office, so it's not just the AUSA, as to whether the target is a worthy federal target. So most of these cases we don't, but if, for example, let's say that he were associated with the Latin Kings, we might have transferred the case because we're doing something with Latin Kings in the neighborhood. In this case, it was based on the fact that he had a horrible criminal record. He had 100 entries, or nearly 100 entries, and 19 convictions. And that's why the decision was made to bring him federally. All right. Thank you. You've satisfied my curiosity. What is the difference between looking around to see if you know someone and counter-surveillance that allows an officer to sort of read his mind and know that it's the latter he's doing and not the former? Well, what he testified was that based on his experience, when someone was involved in a drug deal like this, that looking around was looking to see whether there were cops coming by or somebody else was noticing. No, his testimony, I think, went the other way. His testimony was because the person was engaged in counter-surveillance, you should infer he was part of the drug deal, as opposed to just saying, I don't sell drugs, you can get them from Harry up the street. So the counter-surveillance sort of linked him in to the drug transaction. Rather than the drug transaction. So I'm coming back to what is it that an officer sees that says, oh, that's not looking around for your friends, that's counter-surveillance. It's based on his experience. I mean, I think you have to tie that to the fact that... But what is it, the furrow of his brow? I mean, seriously. If what he's doing is looking out at the cars on the street, then it's not as likely that he's looking to see a friend. If he's looking at the sidewalk to see if he's walking by... How easily can one see somebody who's looking at... How can you see someone in a car driving by? Remember that this was March 20th. So it wasn't like it was the middle of the summer and the windows were down and everything else. But it is a judgment call. But that's why it's based on his experience. He had seen this in a number of incidences. But I think it's also you have to tie it to the testimony that Sergeant Detective Keenan gave as well, which was that drug dealers often work in tandem. And so you had that piece and their experience together working over I don't remember how many years as drug investigators was that these were common techniques. The jury could have believed it or not believed it. But it seems like this is testimony that you could give in 100% of the cases whenever you're charging someone with... You could always say they work in tandem and you could always say instead of... I suppose if a witness was sitting there like that, you couldn't say it. But unless they were, if they were scanning the area, there is counter-surveillance. I have a couple of cases in which you couldn't say it. And that may be right. May I continue? Yes. I think in most drug dealing situations, there is counter-surveillance going on because you don't want to be doing it out in the open. You want to be looking around, making sure that there's no one going to see you. I thought Judge Kyle's point is that in cases in which there was not drug dealing going on, the same thing would be happening. It might be, but here there was drug dealing going on. So is that the key thing here is that we have the testimony from the officer? Yes. So that there was... Which you could believe or not, but it makes it insufficient. Exactly. Did you mention Sergeant Keenan as being one of the witnesses? Yes. And he's the same person that was involved in the lawsuit? Yes, he was. He was one of the defendants that Barry Spencer filed his civil complaint against. What was the time gap between that complaint being filed and this? The complaint was filed in 2006. It was dismissed by the state judge in 2008. This case was 2013. And at the time, in the appendix, there's an affidavit of the AUSA that at the time that he agreed with Suffolk to take the case, he was actually unaware of this civil case. Is there anything telling him whether the officer who was the subject of the complaint played any role in the recommendation that the U.S. Attorney take the case? There's nothing in the record about that. What it does say is that the AUSA who took the case from Suffolk was simply meeting with the Suffolk DA's office. So that's all we know, that they had a conversation with the DA's. Beyond that, there's nothing in the record as to whether he had a conversation with Sgt. Detective Keenan about it. And as you may recall, Barry Spencer was not targeted in this investigation. It was a more general operation to try to clear out a lot of the drug dealing in that area of Dorchester and Roxbury. And it was simply that as Sgt. Keenan and Officer Caseles were driving down the street, Sgt. Keenan saw Barry Spencer, recognized him and then let Officer Caseles out at that point. So there was no sort of concerted effort to go after Barry Spencer in the first place. I thought I read somewhere that Sgt. Keenan actually told Caseles to target the defendant. Once they arrived at that spot, when they were driving down the street going to just sort of general area, what Officer Caseles did as part of this operation was he would be dropped off in various parts of Eggleston Square or other areas and just walk up to people and ask them if they're on, which was the terminology about are you selling drugs. And at that point, when Keenan is driving by, he sees Barry Spencer and he lets out Caseles and says, you know, I know that guy, try and ask him. Can I just ask you how a vindictive prosecution claim would work if there was an evidentiary hearing, which I recognize you're saying doesn't have to be, if there were and it came out that the Suffolk DA's office had been urged all along by the officer who was the subject of the complaint to recommend that the U.S. attorney take the case and the U.S. attorney was unaware of the officer's role in that, would that be relevant to making the case that the federal prosecution was vindictive? In other words, is it that the federal officer himself has to be acting vindictively or is it enough if he was induced to take action for vindictive reasons by a state actor? I don't know the answer to that question except it would seem to me based on the case law of Goodwin and the rest of the cases that it would have to be that the federal government is retaliating against him for his exercise of a constitutional right. So we would have to know something about it because, among other things, if we don't know anything and we think it's a good case, how is that retaliation? But what if you think it's a good case only because you want a good relationship with the Suffolk DA and the only reason the Suffolk DA is recommending it is for vindictive reasons? That should break the chain. That seems problematic. But it also seems as though then you're going too far back into why we bring cases in the first place without any objective reason for questioning that this was a legitimate case. It would seem to me that there has to be something stronger than what you would have, even in that instance. Suffolk wants to retaliate against him. I suppose if you had very strong evidence that the only reason he was targeted was they wanted to retaliate against him and all we wanted to do was make them happy, possible. But I still find that it just seems like it's too many steps removed. The federal government did not engage in retaliatory behavior. It just took the case, saw what the case consisted of, and decided to take it without any of that information. The Court has no further questions. I'll rest on my brief. Thank you.